UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ONA C. ALLEN,

                Plaintiff,

    v.

NORTHWEST PERMANENTE, P.C., an
Oregon corporation,

              Defendant.

Case No. 3:12-cv-0402 -ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

Plaintiff, Ona C. Allen ("Allen"), is a Nurse Practitioner who was employed by Kaiser

Foundation Health Plan of the Northwest ("Health Plan"). The terms and conditions of her

employment were controlled by the collective bargaining agreement ("CBA") between Health

Plan and her union, the Oregon Federation of Nurses and Health Professionals ("OFNHP").

Defendant, Northwest Permanente ("NWP"), through its Credentials Committee, recommends

and monitors the credentialing of healthcare professionals employed by the Health Plan.

On February 7, 2012,[1] Allen filed an Amended Complaint in Multnomah County Circuit Court for the State of Oregon, Case No. 1112-17048, against NWP alleging that it used the forum of its Credentials Committee to cause her discharge from Health Plan by refusing to renew her application for re-credentialing and, as a result, prohibited her from treating patients and earning a salary. She alleged claims for Intentional Interference with Economic Relations, Defamation, Breach of Contract, Breach of Duty of Good Faith, and Equitable Relief and sought to recover punitive damages, economic damages, and non-economic damages for physical, emotional, and mental stress and injury to her personal and professional reputation, as well as reasonable attorney fees.

On March 12, 2012, NWP removed the case to this court pursuant to 28 USC §§ 1441 and 1446, asserting original jurisdiction under 28 USC § 1331. On April 1, 2012, Allen filed a Motion to Remand. Pursuant to the Findings and Recommendation ("F&R") adopted by Judge Brown, that motion was denied because all of Allen's state law claims (except defamation) are preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 USC § 185. Allen filed a Motion for Reconsideration, which was denied on November 30, 2012 (docket #52). Allen also filed a Fourth Amended Complaint (docket #38) which alleges only two claims for defamation and equitable relief.

NWP has now filed a Motion for Summary Judgment (docket #39). For the reasons set forth below, that motion should be granted.

/ / /

/ / /

---

[1] The state court action was commenced earlier than February 7, 2012, with the filing of a Complaint that was not served on NWP. Although the parties have not submitted that date, they agreed at the hearing that the action was commenced in state court after November 2011.

2 - FINDINGS AND RECOMMENDATION

## BACKGROUND[2]

Prior to her discharge in October 2008, Allen had been employed by Health Plan for 25 years. Fourth Amended Complaint, ¶ 2.1. Health Plan requires its professional employees to be credentialed prior to employment and reviews their credentials every two years thereafter. *Id*, ¶ 2.3. Allen's most recent re-credentialing application, prior to the events underlying this action, had been approved in October 2006. *Id*, ¶ 2.5.

Between 2006 and 2008, Allen was involved in three employment disputes with Health Plan. *Id*, ¶ 2.6. Allen filed grievances with OFNHP regarding all three disputes. *Id*. Two of the disputes related to Allen's treatment of patients were allowed to "sunset" after the complaints were investigated and found unsubstantiated. *Id*. The third dispute centered upon a disagreement between Dr. Leila Hotaki, a medical doctor and NWP administrator, regarding Allen's job assignment at Health Plan's Mount Scott facility. *Id*, ¶¶ 2.7, 2.8. This grievance resulted in a mediated agreement between Allen, Health Plan, and OFNHP, which required Allen to transfer to a new position at Heath Plan's Interstate facility. *Id*, ¶ 2.7.

In March 2008, Allen became "concerned" when she learned that she had low scores on an index used by the Credentials Committee to measure an employee's interpersonal skills with patients ("Art of Medicine" or "AOM" index). *Id*, ¶ 2.09. Upon learning of her low scores, Allen requested and received her individual scores which included information about the "scope of the AOM surveys, the basis of the scores, and why they varied between Health Plan facilities." *Id*. However, upon review, the number of patient complaints against Allen was "statistically insignificant" when compared to other health professionals. *Id*. Also in March

---

[2] Many of the undisputed facts in Defendant's Concise Statement of Material Facts (docket # 40) cite to various allegations in the Fourth Amended Complaint. Accordingly, this court cites those allegations.

2008, Health Plan reviewed Allen's work performance and concluded that she met or exceeded all standards required. *Id*, ¶ 2.10.

In July 2008, Allen submitted her application for re-credentialing. *Id*, ¶ 2.11. Sometime prior to August 20, 2008, Dr. Andreas Wolf performed an initial review of Allen's application and concluded that the concerns regarding patient complaints were minor. *Id*, ¶ 2.11.

On August 20, 2008, Dr. Rasjad Lints, the administrator reviewing Allen's application, decided to more thoroughly review the 2006-2007 patient complaints as well as Allen's AOM scores and ultimately concluded that Allen's application should not be approved until completion of a formal investigation. *Id*, ¶¶ 2.4, 2.12. According to Allen, Dr. Hotaki had shared with Dr. Lints the details of the earlier incident between Dr. Hotaki and Allen at the Mt. Scott facility, knowing that Dr. Lints would be reviewing Allen's application. *Id*, ¶ 2.8. Allen also claims that although not a member of the Credentials Committee, Dr. Hotaki was in regular communication with Dr. Lints concerning Allen's re-credentialing application. *Id*, ¶ 2.14.

Sometime during early September 2008, Allen learned for the first time that Dr. Lints was considering the earlier 2006-2007 grievances which had been permitted to "sunset" in connection with her re-credentialing application. *Id*, ¶ 2.15. Upon learning this information, Allen emailed Dr. Lints about these events. *Id*, ¶¶ 2.15, 2.16.

On or about September 15, 2008, the Credentials Committee conferred regarding Allen's application and concluded that Allen had "a problem" and needed to be placed on a Work Improvement Plan ("WIP") or else lose her credentials. *Id*, ¶ 2.17. The WIP focused on Allen's low AOM scores and the alleged patient complaints. *Id*, ¶ 2.18.

On September 30, 2008, Allen learned from Jane Gilronan, a Health Plan supervisor, that the Credentials Committee was requiring Allen to submit to a WIP. *Id*, ¶ 2.18. This was "the

first time" Allen became aware that the Credentials Committee was reviewing her application in a negative light. *Id*. Gilronan contacted Allen to inform her of the WIP while Allen was in New York on approved personal leave. *Id*, ¶ 2.19. Gilronan assisted the Credentials Committee in proposing and drafting the WIP, and told Allen that the WIP "was a NWP thing." *Id*, ¶ 2.20. In response, Allen told Gilronan that she was confused about why the WIP was necessary and whether the WIP would be controlled by NWP, but she never received any explanation, only being told that she was being "uncooperative." *Id*, ¶ 2.21.

On October 23, 2008, Dr. Lints met with the Credentials Committee and recommended that Allen's application for re-credentialing be denied for various reasons, including Allen's record of patient complaints. *Id*, ¶¶ 2.22, 2.23. That same day, the Credentials Committee voted to deny Allen's application. *Id*, ¶ 2.24. On October 24, 2008, Health Plan placed Allen on unpaid administrative leave because without her credentials, she could no longer perform her job responsibilities. Opinion of Arbitrator, pp. 5-6.[3]

Upon receiving the Committee's decision, Allen immediately informed OFNHP which filed a grievance on her behalf. Fourth Amended Complaint, ¶ 2.24. On or around October 2010, OFNHP and Health Plan entered into binding arbitration to resolve the grievance, as required by Policy No. 26 of the Credentialing Policies. *Id*; Credentialing Policies No. 26. A hearing was held over the course of several days in October and November 2010. Opinion of Arbitrator, p. 1. On February 18, 2011, the arbitrator issued his decision, concluding that Allen's grievance was sustained in part and denied in part. *Id*, p. 19. Ultimately, the arbitrator discontinued Allen's paid administrative leave, vacated the termination of Allen's credentials,

---

[3] The parties refer to several documents from the earlier arbitration proceedings that were submitted in connection with the earlier motions. NWP provided courtesy copies to the court, but did not refile the materials. All of the documents are attached to the declarations of Fisher (dockets #8 & #33) and Kitchel (docket #12).

remanded Allen's application for re-credentialing for further proceedings by the Credentials

Committee, and ordered Allen's reinstatement in the event that her application was approved.

*Id*, pp. 19-20.  The arbitrator expressly declined to award back pay.  Request for Clarification,

pp. 1-2.

## **LEGAL STANDARD**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.

*Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted).  The court

must view the inferences drawn from the facts "in the light most favorable to the nonmoving

party."  *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 US 242, 255 (1986).

/ / /

/ / /

6 - FINDINGS AND RECOMMENDATION

## FINDINGS

### I.   Defamation (First Claim)

NWP seeks summary judgment on Allen's First Claim for defamation because:  (1) it is

time-barred; (2) the alleged statements are not defamatory; and (3) the alleged statements are

protected by both the qualified and absolute privileges.

#### A.   Statute of Limitations

The parties agree that the statute of limitations for a defamation claim is one year.

ORS 12.120(2); *Kraemer v. Harding*, 159 Or App 90, 103, 976 P2d 1160, 1169 (1999).  The

statute begins to run on the date of the publication of the false or defamatory statement.  *Bock v.*

*Collier*, 175 Or 145, 148, 151 P2d 732, 734 (1944).

Allen filed this action in state court on some unspecified date (but after November 2011),

followed by an Amended Complaint filed on February 7, 2012.   Therefore, the defamation claim

can be based only on defamatory statements made after November 2010 (or February 7, 2011).

NWP contends that the allegedly defamatory statements were made between 2006 and 2008,

well outside the one-year statute of limitations.  Allen responds that her claim is timely either by

virtue of Oregon's "discovery rule" or application of equitable tolling principles.

#### 1.   Discovery Rule

"The discovery rule applies to defamation actions when the initial publication is

confidential in nature and not something that a plaintiff would be presumed to have known

about, even if he had exercised reasonable diligence."  *Goodman-Herron v. Advanced Nav. &*

*Positioning Corp.*, 940 F Supp 281, 284-85 (D Or 1996), citing *White v. Gurnsey*, 48 Or App

931, 936, 618 P2d 975, 977-78 (1980); *see also Holdner v. Oregon Trout*, 173 Or App 344, 351,

22 P3d 244, 247 (2001).  The discovery rule has been applied where the defamatory information

was contained in a confidential memorandum of which the plaintiff was unaware until his

discharge one month later on the basis of the information in the memorandum. *White*, 48 Or

App at 936, 618 P2d at 978. The court observed that in the employment context, often a plaintiff

has no reason to be aware of the "publication" if the defamatory material is contained in

confidential communications "until he is finally discharged, perhaps not even then." *Id*.

However, a few years later, the discovery rule did not toll the statute of limitations for

defamatory statements made in public at a school board meeting which plaintiffs did not attend.

*Workman v. Rajneesh Found. Int'l*, 84 Or App 226, 230-31, 733 P2d 908, 911, *rev denied*, 303

Or 700, 740 P2d 1213 (1987). The court distinguished the situation in *White*, explaining as

follows:

> [T]he discovery rule was devised to apply to kinds of actions where the
> underlying wrong and its relationship to the injury are inherently resistant
> to prompt discovery. Defamatory comments at public meetings are so
> intrinsically susceptible to immediate discovery that it would be
> anomalous to apply the rule to actions based on them. To do so would, at
> the best, make somewhat more certain what is virtually inevitable, and the
> practical effect of doing so would generally be to add a day or two to the
> statutorily-prescribed limitation period rather than serve the rule's purpose
> of preventing a right of action from becoming time-barred before the basis
> for the action can be known and the action brought.

*Id*, 84 Or App at 231-32, 733 P2d at 911.

Allen claims that the allegedly defamatory statements pertain to complaints about her

interaction with patients and coworkers and were communicated by Dr. Hotaki to Dr. Lints at or

around the time her re-credentialing application was under review. Such statements are more

along the lines of those included in the confidential business memorandum in *White* than the

readily discoverable public statements made in *Workman*. Thus, the discovery rule applies to toll

the statute of limitations until Allen became aware of the publication of these statements. Even

so, it does not save Allen's defamation claim.

Allen argues that she was not aware of who was the wrongful party and what false and/or defamatory information that wrongful party relied upon until the arbitrator issued his written opinion on February 18, 2011.  However, the grievance process had been going on for several years before the arbitrator issued his final written opinion.  In fact, according to Allen's own allegations, she became aware that Dr. Lints was considering the earlier 2006-2007 grievances about patient complaints in connection with her re-credentialing application sometime in September 2008.  Fourth Amended Complaint, ¶¶ 2.15, 2.16.  When she learned that Dr. Lints was considering these grievances, she emailed him, presumably about the fact that the complaints were ultimately allowed to "sunset" as unsubstantiated.  *Id*.

Also in September 2008, Allen became aware that the Credentials Committee was viewing her application in a negative light when she was informed that she was required to submit to a WIP that focused on patient complaints and on improving her AOM scores.  *Id*, ¶ 2.18.  Moreover, sometime in March 2008, even before submitting her application, Allen learned that her AOM scores were low, prompting her to request a copy of her individual scores. *Id*, ¶ 2.09.   Thus, during the time that her application was under review, Allen was well aware that the Credentials Committee, as led by Dr. Lints, was indeed considering the earlier grievances when reviewing her application.

This conclusion is bolstered by the fact that the arbitrator's written opinion does not rehash all of the evidence regarding patient complaints against Allen with regard to the Credentials Committee's non-renewal decision, although it is clear that the arbitrator received testimony on these matters.  *See* Opinion of Arbitrator, p. 2.  The hearing was held over the course of three separate days in October and November 2010, with the last date of testimony occurring on November 23, 2010.  *Id*, p. 1.  Allen attended each day of the hearing.

9 - FINDINGS AND RECOMMENDATION

Supplemental Kitchel Decl. (docket #54), Exs. 1-4.  Therefore, even assuming that Allen was unaware of exactly who said what to whom about her work performance during the review of her application in September 2008, she became aware of this information at the hearing in October and November 2010.

Accordingly, based on the record, the only reasonable conclusion is that Allen knew about the allegedly defamatory statements made by Dr. Hotaki and Dr. Lints by November 23, 2010, at the latest.   It is undisputed that Allen commenced this action more than one year after that discovery.  Thus, even applying the discovery rule to toll the statute of limitations, her defamation claim is time-barred.

## 2.    **Equitable Tolling**

In the alternative, Allen contends that her defamation claim should be equitably tolled until the date the grievance and arbitration process was complete.  Though Allen does not provide an exact date, presumably this date would be when the arbitrator issued his written opinion on February 18, 2011.

 Even though Allen cites to federal law in support of her tolling arguments, her defamation claim is a state law claim, and "[b]road tolling rules, such as those for the litigant's incapacity, the pendency of other proceedings, equitable tolling, and equitable estoppel are borrowed from state law."  *Duncan v. Oregon*, No. 05-1747-KI, 2007 WL 789433, at *3 (D Or Mar. 14, 2007), citing *Sain v. City of Bend*, 309 F3d 1134, 1138 (9th Cir 2002).  Equitable tolling is used sparingly in Oregon.  *Rodriguez v. Williams*, No. 08-290-ST, 2010 WL 1542092, at * 3 (D Or Feb. 25, 2010), *adopted*, 2010 WL 151962 (D Or April 14, 2010).  The doctrine of equitable tolling allows a plaintiff to avoid a statute of limitations if, "despite the exercise of all due diligence he is unable to obtain vital information bearing on the existence of his claim."

*D.H.M. v. Oregon Youth Auth.*, No. 06-413-KI, 2008 WL 1766727, at *5 (D Or April 8, 2008) (citations omitted).  In other words, in Oregon, "equitable tolling is available when circumstances outside the control of the affected party make it impossible to comply with a statute of limitations."  *Rodriguez*, 2010 WL 1542092, at *3.

Allen argues that the statute of limitations should be tolled until her grievance was finally resolved because, as a union member, she was obligated to participate in the grievance process.  Moreover, she participated in the union process with the expectation that it would resolve all of her injuries.  Not until the conclusion of the lengthy grievance and arbitration process did she learn that the harm she suffered could not be fully resolved since the arbitrator declined to award back pay or order her re-credentialing and reinstatement.

It must first be noted that Allen suffered harm well before the grievance process was concluded.  She was first terminated from employment in October 2008 and suffered a loss of pay until her reinstatement on paid leave by the arbitrator in February 2011.  The fact that the arbitrator did not make her whole by awarding her back pay does not change the fact that she suffered harm well before then.

In addition, the record is clear that Allen was represented by counsel at all stages of the grievance and arbitration process which lasted for nearly three years.  Though counsel was hired by the union and did not have a traditional attorney-client relationship with Allen, he was hired for the express purpose of representing her to secure a favorable resolution of her grievance.  Allen has presented no evidence that any circumstances outside of her control prevented her from filing her defamation claim in court within the time frame required by the statute of limitations.  In sum, Allen has not presented any facts sufficient to demonstrate that she is entitled to equitable tolling of the statute of limitations.

11 - FINDINGS AND RECOMMENDATION

### 3.    <u>Self-Compelled Publication</u>

Although not pled in the Fourth Amended Complaint, Allen also asserts that her

defamation claim is timely because of her ongoing job search.  Most recently in February 2012,

Allen applied for a position in New York where she was required to disclose the reason for her

termination and was subsequently refused employment.  Allen Decl. (docket #51), ¶ 7.  This

appears to be a proposed claim of defamation by compelled self-publication.  *See Araujo v.*

*General Elec. Info. Servs.*, 82 F Supp2d 1161, 1171-72 (D Or 2000); *Downs v. Waremart, Inc.*,

137 Or App 119, 131-33, 903 P2d 888, 895-96 (1995), *aff'd in part, rev'd in* part, 324 Or 307,

926 P2d 314 (1996).  In attempting to plead such a claim, Allen seeks to avoid the statute of

limitations bar by changing the date that the defamatory statements were published to February

2012, when she was forced to disclose the reasons for her termination from Health Plan.

However, that case law has been superseded by ORS 30.178(2) which bars defamation

claims by a terminated employee against an employer "based on a claim that in seeking

subsequent employment the former employee will be forced to reveal the reasons given by the

employer for her termination."   In any event, the reason for Allen's termination, namely the lack

of active credentials, was true, and the termination decision was not made by NWP, but by

Health Plan.  Therefore, Allen cannot rely on a claim of defamation by compelled self-

publication to avoid the statute of limitations bar.

### B.    <u>Elements of a Defamation Claim</u>

Even if Allen's defamation claim was timely filed, she must prove that NWP made

defamatory statements about her, that the statements were published or communicated, and that

she suffered harm as a result of the statements.  *Lansford v. Georgetown Manor, Inc.*, 192 Or

App 261, 269, 84 P3d 1105, 1111 (2004).  The parties appear to primarily dispute whether Allen

has sufficiently alleged that NWP made any defamatory statements.

"A defamatory communication is one that would subject another to '. . . hatred, contempt

or ridicule . . . [or] tend to diminish the esteem, respect, goodwill or confidence in which [the

other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the

other].'"  *Reesman v. Highfill*, 327 Or 597, 603, 965 P2d 1030, 1034 (1998), quoting *King v.*

*Menolascino*, 276 Or 501, 504, 555 P2d 442, 443 (1976) (alterations in original).  "To be

actionable, a communication must be both false and defamatory."  *Id*, 327 Or at 604, 965 P2d at

1034.  Truth is a complete defense to a defamation claim.  *Bahr v. Statesman Journal*, 51 Or App

177, 180, 624 P2d 664, 666, *rev denied*, 291 Or 118, 631 P2d 341 (1981).  Furthermore, the

defamatory statement must be about the plaintiff and it must be published or communicated.

*Wallulis v. Dymowski*, 323 Or 337, 343, 918 P2d 755, 758 (1996) (*en banc*) (citations omitted).

A statement is published when it is "communicated to a third party."  *Id*.

"The court, rather than the jury, determines whether a communication is capable of a

defamatory meaning."  *Reesman*, 327 Or at 603, 965 P2d at 1034, citing *King*, 276 Or at 504, 55

P2d at 443.  "In making that determination, the court looks to the context in which the

communication was made."  *Id*.  "Even a communication that is not defamatory on its face may

be defamatory if a reasonable person could draw a defamatory inference from the

communication."  *Id*.

Oregon law recognizes two privileges as defenses to defamation, an absolute and a

qualified privilege.  *Wallulis*, 323 Or at 347-48, 918 P2d at 760-61.  An absolute privilege bars a

claim for defamation, while a qualified privilege does not bar the claim, but "requires [the]

plaintiff to prove that the defendant abused the privileged occasion."  *Id*.

13 - FINDINGS AND RECOMMENDATION

Allen contends that NWP defamed her when it recommended the denial of her credentials for false reasons. Specifically, Allen claims that the Credentials Committee decided to recommend the denial of her re-credentialing application on the basis of charges that were revealed, after an investigation, to be unsubstantiated and were allowed to expire without any notation in her employment file. Fourth Amended Complaint, ¶¶ 2.6, 2.7, 2.17. Since the charges against her were proven to be unsubstantiated, Allen contends that the statements must be considered false. Allen also alleges that the Credentials Committee, as headed by Dr. Lints, relied on false statements by Dr. Hotaki that Allen was not interested in improving the quality of her work and that her union activities compromised the quality of her work. *Id*, ¶ 2.14. Moreover, Allen argues that the Credentials Committee's "statement" recommending denial of Allen's credentials is a communication capable of defamatory meaning because it implies to the public that Allen performed her job poorly and was not qualified to practice medicine as a Nurse Practitioner.

The central issue is whether these alleged statements were defamatory. While Allen asserts that the underlying complaints that formed the basis of her grievances in 2006-2007 were proven to be unsubstantiated, this does not necessarily imply that the Credentials Committee's concerns about Allen's treatment of patients were false. The Fourth Amended Complaint includes additional allegations regarding Allen's low AOM scores which measure an employee's interpersonal skills with patients. The basis for Allen's low AOM scores may well have been wholly separate from the complaints that formed the basis of the 2006-2007 grievance and investigation that were deemed unsubstantiated. Despite requesting her scores, information about how they were calculated and how they compared with her peers, Allen has not submitted this evidence to the court. In fact, other than her own assertions, Allen has presented no

evidence whatsoever to establish that Health Plan's concerns about patient care and complaints were false. Nor has she presented any evidence that Dr. Hotaki's statements about the quality of Allen's work were false.

Allen conceded at the hearing that she has not presented any facts to support her allegations because this court has denied her requests for discovery. Although she has been provided with her union's entire file, all of the submissions to the arbitrator, and the complete transcript of the arbitration hearing, she contends that she has been hampered by her inability to take any depositions to ascertain exactly what was said to whom and why or to clarify the actual relationship between NWP, Health Plan, and the Credentials Committee.

The problem with this excuse is that Allen cannot prosecute a defamation claim unless she has been harmed by the publication of a defamatory statement. In other words, she has to relate her damage to some defamatory statement published by NWP or its agent to a third party. It is clear from the allegations in the Fourth Amended Complaint that she blames the adverse decision by the Credentials Committee squarely on the allegedly false statements made by Dr. Hotaki. However, the validity of the reasons given for non-renewal of Allen's credentials was the subject of the arbitration hearing. Both Allen (through her union) and the Health Plan fully and fairly litigated those reasons through the grievance process by presenting witnesses and exhibits. The arbitrator did not specifically rule on the validity of those reasons due to the procedural deficiencies in the handling of Allen's application by the Credentials Committee. Nonetheless, Allen was not then, and is not now, ignorant of the facts on which she bases her defamation claim. Just as she did in the arbitration hearing, she could have submitted a declaration to establish why the alleged statements by Dr. Hotaki were false. She has not done

this.  Her declaration (docket #51) contains no information regarding any allegedly false statements, much less who made them, when they were made, or why they are false.

Finally, to the extent that the Credentials Committee's decision to recommend denial of Allen's re-credentialing application can even be considered a communication for defamation purposes, the evidence establishes that the denial was a true statement:  the Credentials Committee recommended that Allen's application be denied.   Just because the Credentials Committee may have relied on allegedly false information from Dr. Hotaki in reaching that decision does not render the decision itself defamatory.

## 1. **Qualified Privilege**

Even if Allen can prove that the alleged statements were false, she cannot overcome NWP's qualified privilege.  A statement is qualifiedly privileged if:  "(1) it was made to protect the interests of defendants; (2) it was made to protect the interests of plaintiff's employer; or (3) it was on a subject of mutual concern to defendants and the persons to whom the statement was made."  *Wattenburg v. United Med. Labs., Inc.*, 269 Or 377, 380, 525 P2d 113, 114 (1974). A plaintiff may overcome a qualified privilege by proving that the defendant acted with actual malice.  *Christianson v. State*, 239 Or App 451, 459, 355 P3d 904, 908 (2010), *rev denied*, 350 Or 297, 255 P3d 489 (2011), citing *DeLong v. Yu Enters., Inc.*, 334 Or 166, 170, 47 P3d 8, 10 (2002).  "The burden of proving an abuse of the qualified privilege, however, rests upon the plaintiff."  *Walsh v. Consolidated Freightways*, 278 Or 347, 356, 563 P2d 1205, 1211 (1977).

Here the evidence supports a qualified privilege.  First, the statements made by Dr. Hotaki to Dr. Lints were made in the context of reviewing Allen's credentials.  Having employees who are properly credentialed is a "subject of mutual concern" to Drs. Hotaki and Lints.  *Wattenburg*, 269 Or at 380, 525 P2d at 114.  Consequently, to the extent that Dr. Hotaki's

statements to Dr. Lints were defamatory, they are protected by a qualified privilege.  Similarly,

Dr. Lints' decision to consider the patient complaints that were the subject of the 2006-2007

grievances and the Credential Committee's denial of Allen's application are also qualifiedly

privileged.  There can be no doubt that these statements were "made to protect the interests of

plaintiff's employer," Health Plan, since all the statements were made in connection with the

review of Allen's application for re-credentialing.  *Id.*

Although Allen alleges that NWP acted with malice in making these statements, she has

presented no actual evidence to support this assertion to overcome the qualified privilege.[4]

Again, Allen attributes this lack of evidence to the lack of discovery.  However, at the arbitration

hearing, the union argued that Allen was the subject of retaliation for her union activities and

presumably presented supporting evidence.  Since Allen attended the arbitration hearing and has

had access to the union's file and the hearing transcript, it is unclear what further discovery is

needed.

## 2.    <u>Absolute Privilege</u>

NWP also asserts that the absolute privilege bars Allen from relying on any information

learned during the arbitration hearing to support her defamation claims.  It is well-established

that "statements made as part of judicial and quasi-judicial proceedings are absolutely

privileged."  *DeLong*, 334 Or at 171, 47 P3d at 10.  The parties do not dispute that the arbitration

hearing was a quasi-judicial proceeding.  However, NWP contends that any statements made at

the hearing, including those that were made long before the hearing itself commenced, are

absolutely privileged merely because they were restated or discussed during the course of the

---

[4]  NWP also relies on two forms signed by Allen in connection with the arbitration in which she acknowledged that the credentialing proceedings were privileged and confidential and released NWP from liability.  Kitchel Decl. (docket #54), ¶¶ 8, 9, Exs. 5, 6 (Arbitration Exs. 11, 12).  However, these forms do not alone establish the qualified privilege for defamatory statements or release NWP for defamation.

arbitration.   In support, NWP relies on *Ramstead v. Morgan*, 219 Or 383, 387, 347 P2d 594, 596

(1959), where the court explained the rationale behind the defense of absolute privilege is as

follows:

> The absolute privilege to publish defamatory matter under the
> circumstances to which the privilege applies is based on the ground that
> there are certain relations of life in which it is so important that the
> persons engaged in them should be able to speak freely that the law takes
> the risk of their abusing the occasion and speaking maliciously as well as
> untruly, and in order that their duties may be carried on freely and without
> fear of any action being brought against them, it says:  'We will treat as
> absolutely privileged any statement made in the performance of these
> duties.'

*Id*, citing *Moore v. Weaver*, 2 KB 520, 521 (1928).

After making this general statement about the purpose of absolute privilege, the court

then exhaustively lists circumstances in which such statements may be protected, including

letters written to the Labor Department, written objections to the Elections Board, affidavits filed

to the Lunacy Commission, or a landlord's letter filed with the Rent Control Authority, among

many others.  *Id*, 219 Or at 388-90, 347 P2d at 596-97.  The common element in each of these

examples is that the statements were affirmatively made in connection with a particular matter

being challenged or decided.

Here, in contrast, the allegedly defamatory statements were made long before the

arbitration itself and were merely repeated years later at the hearing.  At the time the statements

were originally made, Allen had not yet filed a grievance and no other kind of proceeding was

pending that one would expect that their statements might be protected.  *See Hyles v. Mensing*,

849 F2d 1213, 1217 (9th Cir 1988) (discussing the rationale for the rule that statements made in

grievance proceedings are absolutely privileged).  Moreover, there is no allegation that the

statements were ever submitted to the arbitrator by way of affidavit, letter, or any other formal

18 - FINDINGS AND RECOMMENDATION

process.  The statements were merely reiterated at the hearing as a part of the evidence Health

Plan submitted to justify its reasons for terminating Allen's employment.  While the statements

undoubtedly bore on the arbitrator's decision regarding whether the Credentials Committee acted

appropriately in recommending denial of Allen's application, the statements themselves were

made much earlier and were just a small subset of the evidence received by the arbitrator in

resolving Allen's grievance.  Perhaps most significant, the purpose of the arbitration was to

resolve Allen's grievance, not to determine whether the allegedly defamatory statements were

true.  The arbitrator's written opinion does not mention any of these statements at all, suggesting

that his decision did not hinge upon them in any way.   Consequently, this court is not persuaded

by NWP's argument that just because the statements were reiterated at the arbitration hearing,

they are absolutely privileged.

> ### C.    <u>Conclusion</u>

Because Allen's defamation claim is barred by the statute of limitations and because

Allen has failed to allege facts sufficient to establish that she is entitled to relief, NWP should be

granted summary judgment on the First Claim.

## II.    <u>Equitable Relief (Second Claim)</u>

The Second Claim for Equitable Relief alleges that NWP "breached its contract with

Allen" when it intentionally violated her rights "under the terms and conditions of her

employment . . . in a defamatory manner that was reckless and/or malicious."  Fourth Amended

Complaint, ¶¶ 4.2-4.3.   Despite its name, this is essentially a breach of contract claim.  NWP

contends that it is entitled to summary judgment because Allen never had a contract with NWP,

any claim that is based on Allen's contract with Health Plan is preempted because it requires an

interpretation of the CBA, NWP is not the proper party for an action against the Credentials

Committee, since it was acting on behalf of Health Plan, and Allen's claims were fully and fairly addressed through final and binding arbitration.

Allen contends that a contract existed between her and NWP because she submitted her application for re-credentialing to NWP which NWP accepted and, thus, was bound to review in good faith and in accordance with federal peer review standards. However, Allen provides no proof of such a contract and cites no authority to support her position that by merely submitting her application to NWP for review, as required by her employment with Health Plan, NWP agreed to assume any duty whatsoever to her, much less any contractual duties.

Again Allen blames this lack of proof on the lack of discovery to ascertain the alignment between the parties. However, the record contains both the CBA and the applicable Credentialing and Recredentialing Policies and Procedures, as well as the arbitration briefs and decision. According to those documents, it is undisputed that Allen's employment with Health Plan was controlled by the CBA and that Health Plan delegated the credentialing process to NWP. Allen appears to be trying to create a contract where none exists.

Moreover, as this court has previously determined, all of Allen's state law claims (except for defamation) pertaining to the credentialing process are preempted by § 301 of the LMRA because the credentialing process was a component of Allen's employment and subject to the CBA. *See* F&R dated May 30, 2012 (docket #20), Opinion and Order dated November 30, 2012 (docket #52). Specifically, the LMRA preempts Allen's state law claims for Intentional Interference with Economic Relations, Breach of Contract, Breach of Duty of Good Faith, and Equitable Relief. F&R, p. 11. Although Allen has amended her complaint to omit most of these claims, the allegations in her original claim for equitable relief and her current claim for equitable relief are identical. *Compare* Amended Complaint, ¶¶ 7.1-7.3 *with* Fourth Amended

Complaint, ¶¶ 4.1-4.3.  Nothing provided since this court's prior ruling changes the fact that the

equitable relief claim is preempted by the LMRA.  Simply put, Allen's claims were fully and

fairly addressed through the grievance and arbitration process.  The fact that Allen remains

dissatisfied with the outcome does not change the fact that her claim for Equitable Relief remains

preempted by § 301 of the LMRA.  Consequently, NWP should be granted summary judgment

on the Second Claim.

## RECOMMENDATION

For the reasons set forth above, NWP's Motion for Summary Judgment (docket #39)

should be GRANTED, and a Judgment should be entered in favor of NWP on all claims.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.

Objections, if any, are due Monday, January 21, 2013.  If no objections are filed, then the

Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the

Findings and Recommendations will go under advisement.

DATED January 2, 2013.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge